# In the United States Court of Federal Claims

### No. 18-1894L
### Filed: August 30, 2019

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| ELIZABETH ORR, HOWARD CARMAN, and LENA CARMAN, | \* \* \* \* \* |
| **Plaintiffs,** | \* \* Takings; Motion to Dismiss; Failure to State a Claim; Lack of Jurisdiction; Tort; Doctrine of Necessity |
| **v.** | \* \* |
| UNITED STATES, | \* \* |
| **Defendant.** | \* \* |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**Brian K. Matise**, Burg Simpson Eldredge Hersh & Jardine, P.C., Englewood, CO for plaintiffs. With him was **Nelson Boyle**, Burg Simpson Eldredge Hersh & Jardine, P.C., Englewood, CO.

**Brian R. Herman**, Trial Attorney, Environment & Natural Resources Division, Natural Resources Section, United States Department of Justice, Washington, D.C., for defendant. With him were **Jean E. Williams**, Deputy Assistant Attorney General, Environment & Natural Resources Division and **Jeffrey B. Clark**, Assistant Attorney General, Environment & Natural Resources Division. **Bryan Wilson**, Attorney-Advisor, Office of the Field Solicitor, United States Department of the Interior, Billings, MT, of counsel.

### O P I N I O N

<u>**HORN, J.**</u>

### FINDINGS OF FACT

Plaintiffs Elizabeth Orr, Howard Carman, and Lena Carman filed a complaint in the United States Court of Federal Claims on December 10, 2018 against the United States alleging "claims for taking of their real and personal property entitling them to just compensation under the Fifth Amendment to the United States Constitution." According to plaintiffs, "[d]uring the entire month of September 2013, Plaintiff Elizabeth Orr owned a house and surrounding real estate located in in [sic] the Big Thompson River Canyon" in Larimer County, Colorado and "Plaintiffs Howard and Lena Carman owned a home, business, and surrounding real estate located in in [sic] the Big Thompson River Canyon" also in Larimer County, Colorado. Plaintiffs allege that "[t]he properties owned by [Elizabeth] Orr and the Carmans are located below the Olympus Dam, which holds back a reservoir known as Lake Estes." In the complaint, plaintiffs assert that "[t]he Olympus

Dam is part of what is known as the Big Thompson Project," is owned and operated by the United States Department of the Interior's Bureau of Reclamation (Bureau of Reclamation). The complaint alleges that the Olympus Dam was designed as "an interconnected network of reservoirs and tunnels that are not intended to stop water, but instead are intended to store and deliver water to Colorado's Front Range communities, and provide hydroelectric power," and is "not authorized or designed for flood control."

Plaintiffs assert that between September 9, 2013 and September 13, 2013, "there were predictions of historic rainfall and flooding for Larimer County, Colorado," due to a "slow-moving cold front" that had stalled over the region. Plaintiffs allege that forecasters predicted that "the slow moving storm system could lead to large amounts of rainfall over a period of several days," prompting the National Weather Service to issue "several flash flood watches and warnings for Boulder and Larimer Counties." In the complaint, plaintiffs assert that the heavy rainfall "in Boulder County and Larimer County, Colorado, result[ed] in unusually high water levels in creeks and rivers."

Plaintiffs contend that, initially, "[d]espite those predictions of historic rainfall and flooding, the Bureau of Reclamation kept the release flow rate from Olympus Dam at only 80 cfs [cubic feet per second] from September 9, 2013 until 3:05 a.m. on September 12, 2013," and the "water level at Olympus Dam rose dramatically." "At 3:05 a.m. on September 12, 2013," plaintiffs assert that the Bureau of Reclamation began to increase the flows from Olympus Dam. As a result of the heightened flow, plaintiffs claim that "[d]uring the morning of September 12, 2013, civil authorities notified Plaintiffs and other residents of the need to evacuate their homes due to possible flooding and the closure of nearby highways due to flooding." According to the complaint, the Carmans were able to leave promptly and "left behind substantially all of their possessions," while "Plaintiff [Elizabeth] Orr could not leave her property" as "the roads were closed." Instead, according to the complaint, Ms. Orr "remained at her home until that evening and she went to a neighbor's house when the river continued to rise later that evening."

Plaintiffs contend that on September 13, 2013, "[a]ccording to one report, at 11:30 p.m., the Bureau of Reclamation opened flood gates and increased the release flow from the Olympus Dam to more than 5,200 cfs" and "continued to release water from the Olympus Dam at rates near or above 5,000 cfs throughout most of the early morning hours of September 13, 2013." According to the complaint, the "sudden and enormous release of water from the Olympus Dam caused catastrophic" flooding below the dam "on the night of September 12-13, 2013 and continuing high release flows thereafter." Plaintiffs allege that they "lost substantially all of their homes, the business owned by the Carmans, and their personal property" as well as "large sections of the land and riverfront property owned by Plaintiffs," which were "displaced or permanently removed" when they were "washed away in the floodwaters released by the Bureau of Reclamation."

Plaintiffs' complaint alleges that "[d]efendant's actions constituted a taking of property or inverse condemnation." Plaintiffs contend that:

> Defendant, through its agents and employees at the Bureau of Reclamation, made a conscious decision to release water from the Olympus Dam in such quantity as to create a probability, if not a certainty, that Plaintiffs' real property, homes, business, and personal property would be destroyed. Defendant made the determination to take Plaintiffs' property through its actions in releasing water from the Olympus Dam due to its concern for the integrity of the dam and the greater public good in preserving the dam and preventing the possible loss of lives if the dam broke versus Plaintiffs' property.

Moreover, plaintiffs argue that damage to plaintiffs' property "would not have occurred but for Defendant's actions." According to plaintiffs, damages, including "the loss of the use, occupancy, and enjoyment of the Plaintiffs' homes and properties and the displacement or permanent removal or alteration of the Plaintiffs' real property" were the "foreseeable result of the Defendant's actions, including the Defendant's intentional discharge of water from the dam." Plaintiffs further assert that:

> Pursuant to the Fifth Amendment to the United States Constitution and applicable federal law, Plaintiffs are entitled to recover the fair market value of their property that was taken, the fair value of the time they were dispossessed from their property, the actual cost to repair and replace the property that can be repaired and replaced; [and] the fair lost market value in their properties due to the flooding.[1]

In response to the complaint, defendant filed a motion to dismiss pursuant to Rule 12(b)(6) (2018) of the Rules of the Court of Federal Claims (RCFC), stating "three primary reasons" for dismissal:

> First, the Bureau [of Reclamation]'s actions in releasing water from Olympus Dam were in response to a threat to lives and property downstream during a state and federally-declared emergency, and the United States is not liable for a taking. Second, Plaintiffs have not pleaded a viable takings claim; the claim pleaded sounds in tort. Finally, Plaintiffs have failed to plead sufficient factual content to support the causation element of any takings claim.

Defendant asserts that "the government's operation of Olympus Dam was an exercise of its police power in an emergency, not a taking." According to defendant, police power "is about protecting lives and property," and that "there is no compensable taking when the

---

[1] In the complaint, plaintiffs also request "pre and post-judgment interest;" "reasonable costs, litigation expenses, and attorney and witness fees;" "all other damages and compensation to which they are legally entitled;" and "further relief as equity and justice may allow or require." In the complaint, plaintiffs do not state specific amounts requested for recovery, nor do they differentiate the claims for relief between the Carmans and Elizabeth Orr.

government engages in unavoidable, reasonable exercise of the police power that serves the public interest, particularly where there is an extreme threat to public health, safety, or welfare." (citing Miller v. Schoene, 276 U.S. 272, 279-80 (1928)). Defendant claims that the Bureau of Reclamation increased the Olympus Dam's release flow in September 2013 "to preserve the dam and protect lives and property." According to defendant, "[t]he magnitude of this storm and the resultant flooding led both [Colorado] Governor Hickenlooper and President Obama to declare states of emergency in Colorado." "[A] breach or failure of the dam," defendant asserts, "would [have] cause[d] massive additional flooding in the midst of an already-existing emergency—the dam posed a 'grave threat[] to the lives and property of others.'" (alterations in original) (quoting Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1029 n.16 (1992)). Citing to Lucas v. South Carolina Coastal Council, 505 U.S. at 1029 n.16, defendant contends that because the Bureau of Reclamation increased the Olympus Dam's flow to "preserve the dam and protect lives and property . . . its actions do not give rise to a claim for a taking."

Defendant also argues that plaintiffs' cause of action for "inverse condemnation" "sounds in tort," arguing that plaintiffs previously made similar arguments in plaintiffs' earlier filed case in the United States District Court for the District of Colorado. See Compl., Orr v. United States, No. 17-02420 (D. Colo. Oct. 6, 2017).[2] Defendant notes that before the plaintiffs' dismissed the District Court case on March 1, 2018, plaintiffs argued that the Bureau of Reclamation "failed to meet the standard of reasonable care" under a negligence theory. See Notice of Dismissal, Orr v. United States, No. 17-02420 (D. Colo. Mar. 1, 2018).

Defendant further alleges in its motion to dismiss that plaintiffs' "factual allegations to support causation" are "entirely conclusory, and insufficient for pleading purposes" because plaintiffs "have not pleaded any facts supporting a conclusion that the dam made them worse off." Defendant asserts that "their repeated references to the historic nature of the storm only support the inference that their properties would have flooded regardless." Thus, defendant argues, the court should dismiss plaintiffs' complaint for failure to state a claim upon which relief may be granted.

Plaintiffs responded to the motion to dismiss, in which plaintiffs acknowledge their initial attempt to recover "under both the Federal Tort Claims Act for negligent conduct, as well as bringing claims for inverse condemnation based on a taking of property by the

---

[2] Before filing in the United States District Court for the District of Colorado, as defendant notes in its motion to dismiss, on September 2, 2015, plaintiffs Elizabeth Orr and the Carmans "sent a letter to the Department of Interior addressed to the Bureau of Reclamations National Operations Center in Denver, Colorado in which they informed the Bureau of Reclamation of notice of their tort claim," and "[o]n or about September 3, 2015" submitted a "Notice of Claim on Standard Form 95 to the Administrative Office of the Courts," pursuant to the Federal Tort Claims Act. See Compl. at 2-3, Orr v. United States, No. 17-02420 (D. Colo. Oct. 6, 2017) Two years later, "[o]n or about April 6, 2017, the Bureau of Reclamation issued a final denial of Plaintiffs' claims." Id. at 3. The current complaint in this court was filed on December 10, 2018.

4

United States for the public good." Plaintiffs emphasize, however, that they "dismissed their tort claims and only assert a single claim for inverse condemnation in this matter." Plaintiffs then proceed to argue that their complaint is sufficient to establish a cause of action under the Takings Clause of the Fifth Amendment, as the "facts of the Complaint establish deliberate, affirmative acts of the Bureau of Reclamation to release water in order to preserve Government property, with the known and foreseeable result that Plaintiffs' property would be washed away."

Plaintiffs also argue in their response to defendant's motion to dismiss, that defendant's efforts to assert a valid exercise of police powers "are inapposite to the facts in this case." Plaintiffs assert that defendants rely exclusively on "regulatory taking police power cases" which are "readily distinguishable" from the "<u>physical appropriation</u>" in the instant case. (emphasis in original). Further, addressing the question of causation raised by defendant's motion to dismiss, "whether Plaintiffs' property would have been washed away in the absence of the sudden release of water, or the absence of the dam," plaintiffs allege that "the water released by the Olympus Dam . . . would have only been 3450 cfs at peak." Plaintiffs argue that "[t]he 5200 cfs flow caused by the Government was significantly greater than the maximum natural flow caused by the extreme flood. Plaintiffs' property was not flooded – let alone washed away – by the release of 2500 cfs during the day of September 12, 2013." In addition, plaintiffs request that "if the court determines that additional factual allegations are required to support one or more elements, Plaintiffs request the opportunity to amend their Complaint pursuant to RCFC 15."

Defendant filed a reply in support of its motion to dismiss, arguing that it is "well-established" "that government action prompted by an imminent emergency posing a threat to lives and property is not a taking requiring just compensation." Defendant contends that plaintiffs fail to allege "sufficient factual content" to "satisfactorily cross the line from tort into taking" and thus defendant requests the court dismiss plaintiffs' complaint "with prejudice for failure to state a claim."

## DISCUSSION

Regarding defendant's motion to dismiss, when examining what must be pled in order to state a claim, a plaintiff need only state in the complaint "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2) (2019); <u>see</u> <u>also</u> <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007). The United States Supreme Court has stated:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [<u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)]; <u>Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.</u>, 40 F.3d 247, 251 (7th Cir. 1994), a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, <u>see</u> <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts

"are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), on the assumption that all the allegations in the complaint are true (even if doubtful in fact), see, e.g., Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508, n.1 (2002); Neitzke v. Williams, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely") . . . . [W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.

Bell Atl. Corp. v. Twombly, 550 U.S. at 555-56, 570 (footnote and other citations omitted; omissions in original); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555-57, 570); Am. Bankers Ass'n v. United States, No. 2018-1341, 2019 WL 3720017, at *2 (Fed. Cir. Aug. 8, 2019); Frankel v. United States, 842 F.3d 1246, 1249 (Fed. Cir. 2016); A&D Auto Sales, Inc. v. United States, 748 F.3d 1142, 1157 (Fed. Cir. 2014); Bell/Heery v. United States, 739 F.3d 1324, 1330 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); Kam-Almaz v. United States, 682 F.3d 1364, 1367 (Fed. Cir. 2012) ("The facts as alleged 'must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).'" (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 557)); Totes-Isotoner Corp. v. United States, 594 F.3d 1346, 1354-55 (Fed. Cir.), cert. denied, 562 U.S. 830 (2010); Bank of Guam v. United States, 578 F.3d 1318, 1326 (Fed. Cir.) ("In order to avoid dismissal for failure to state a claim, the complaint must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 557)), reh'g and reh'g en banc denied (Fed. Cir. 2009), cert. denied, 561 U.S. 1006 (2010); Cambridge v. United States, 558 F.3d 1331, 1335 (Fed. Cir. 2009) ("[A] plaintiff must plead factual allegations that support a facially 'plausible' claim to relief in order to avoid dismissal for failure to state a claim." (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)); Cary v. United States, 552 F.3d 1373, 1376 (Fed. Cir.) ("The factual allegations must be enough to raise a right to relief above the speculative level. This does not require the plaintiff to set out in detail the facts upon which the claim is based, but enough facts to state a claim to relief that is plausible on its face." (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555, 570)), reh'g denied (Fed. Cir.), cert. denied, 557 U.S. 937 (2009); Christen v. United States, 133 Fed. Cl. 226, 229 (2017); Christian v. United States, 131 Fed. Cl. 134, 144 (2017); Vargas v. United States, 114 Fed. Cl. 226, 232 (2014); Fredericksburg Non-Profit Hous. Corp. v. United States, 113 Fed. Cl. 244, 253 (2013), aff'd, 579 F. App'x 1004 (Fed. Cir. 2014); Peninsula Grp. Capital Corp. v. United States, 93 Fed. Cl. 720, 726-27 (2010), appeal dismissed, 454 F. App'x 900 (Fed. Cir. 2011); Legal Aid Soc'y of N.Y. v. United States, 92 Fed. Cl. 285, 292, 298 n.14 (2010).

When deciding a case based on a failure to state a claim, the court "must accept as true the factual allegations in the complaint." Engage Learning, Inc. v. Salazar, 660 F.3d 1346, 1355 (Fed. Cir. 2011); see also Erickson v. Pardus, 551 U.S. 89, 94 (2007) ("In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555-56 (citing Swierkiewicz v. Sorema N. A., 534 U.S. at 508 n.1))); Scheuer v. Rhodes, 416 U.S. at 236 ("Moreover, it is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader."), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982), recognized by Davis v. Scherer, 468 U.S. 183, 190 (1984); Harris v. United States, 868 F.3d 1376, 1379 (Fed. Cir. 2017) (citing Call Henry, Inc. v. United States, 855 F.3d 1348, 1354 (Fed. Cir. 2017)); United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1327-28 (Fed. Cir. 2006); Samish Indian Nation v. United States, 419 F.3d 1355, 1364 (Fed. Cir. 2005); Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002), cert. denied, 538 U.S. 906 (2003).

In the above-captioned complaint, plaintiffs allege that defendant's action "constituted a taking of property or inverse condemnation." The Takings Clause of the Fifth Amendment to the United States Constitution provides in pertinent part: "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V. The purpose of this Fifth Amendment provision is to prevent the government from "'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Ark. Game & Fish Comm'n v. United States, 568 U.S. at 31 (quoting Armstrong v. United States, 364 U.S. 40, 49 (1960)); see also Palazzolo v. Rhode Island, 533 U.S. 606, 618 (2001) (quoting Armstrong v. United States, 364 U.S. at 49), abrogated on other grounds by Lingle v. Chevron U.S.A. Inc., 544 U.S. 528 (2005), recognized by Hageland Aviation Servs., Inc. v. Harms, 210 P.3d 444 (Alaska 2009)); Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 123-24, reh'g denied, 439 U.S. 883 (1978); Lingle v. Chevron U.S.A. Inc., 544 U.S. at 536; E. Enters. v. Apfel, 524 U.S. 498, 522 (1998); Pumpelly v. Green Bay & Miss. Canal Co., 80 U.S. (13 Wall.) 166, 179 (1871) (citing to principles which establish that "private property may be taken for public uses when public necessity or utility requires" and that there is a "clear principle of natural equity that the individual whose property is thus sacrificed must be indemnified"); Rose Acre Farm, Inc. v. United States, 559 F.3d 1260, 1266 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2009), cert. denied, 559 U.S. 935 (2010); Janowsky v. United States, 133 F.3d 888, 892 (Fed. Cir. 1998); Res. Invs., Inc. v. United States, 85 Fed. Cl. 447, 469-70 (2009).

"[A] claim for just compensation under the Takings Clause must be brought to the Court of Federal Claims in the first instance, unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statute." E. Enters. v. Apfel, 524 U.S. at 520 (citing Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1016-19 (1984)); see also Acceptance Ins. Cos. v. United States, 503 F.3d 1328, 1336 (Fed. Cir. 2007); Morris v. United States, 392

F.3d 1372, 1375 (Fed. Cir. 2004) ("Absent an express statutory grant of jurisdiction to the contrary, the Tucker Act provides the Court of Federal Claims exclusive jurisdiction over takings claims for amounts greater than $10,000."); Altair Global Credit Opportunities Fund (A), L.L.C. v. United States, 138 Fed. Cl. 742, 754 (2018) (quoting E. Enters. v. Apfel, 524 U.S. at 520). The United States Supreme Court has declared: "If there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the [United States Court of Federal Claims] to hear and determine." Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 12 (1990) (quoting United States v. Causby, 328 U.S. 256, 267 (1946)); see also Lion Raisins, Inc. v. United States, 416 F.3d 1356, 1368 (Fed. Cir. 2005); Narramore v. United States, 960 F.2d 1048, 1052 (Fed. Cir. 1992); Hardy v. United States, 127 Fed. Cl. 1, 7 (2016); Perry v. United States, 28 Fed. Cl. 82, 84 (1993).

To succeed under the Fifth Amendment Takings Clause, a plaintiff must show that the government took a private property interest for public use without just compensation. See Dimare Fresh, Inc. v. United States, 808 F.3d 1301, 1306 (Fed. Cir. 2015) (stating that the "'classic taking'" is one in which the government directly appropriates private property for its own use (quoting Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 324 (2002)), cert. denied, 136 S. Ct. 2461 (2016); Adams v. United States, 391 F.3d 1212, 1218 (Fed. Cir. 2004), cert. denied, 546 U.S. 811 (2005); Arbelaez v. United States, 94 Fed. Cl. 753, 762 (2010); Gahagan v. United States, 72 Fed. Cl. 157, 162 (2006). The government must be operating in its sovereign rather than in its proprietary capacity when it initiates a taking. See St. Christopher Assocs., L.P. v. United States, 511 F.3d 1376, 1385 (Fed. Cir. 2008).

"The issue of whether a taking has occurred is a question of law based on factual underpinnings." Huntleigh USA Corp. v. United States, 525 F.3d 1370, 1377-78 (Fed. Cir.), cert. denied, 555 U.S. 1045 (2008). "[M]ost takings claims turn on situation-specific factual inquiries." Ark. Game & Fish Comm'n v. United States, 568 U.S. at 32 (citing Penn Cent. Transp. Co. v. City of New York, 438 U.S. at 124); see also Moden v. United States, 404 F.3d 1335, 1342 (Fed. Cir. 2005) (finding that summary judgment "should not be granted precipitously" "due to the fact-intensive nature of takings cases" (citing Yuba Goldfields, Inc. v. United States, 723 F.2d 884, 887 (Fed. Cir. 1983))); In re Upstream Addicks & Barker (Texas) Flood-Control Reservoirs, 138 Fed. Cl. 658, 664 (2018) (stating that courts tend to be slow to dismiss takings claims, preferring to first develop a factual record (quoting Moden v. United States, 404 F.3d at 1342; and Ark. Game & Fish Comm'n v. United States, 568 U.S. at 29)).

The United States Court of Appeals for the Federal Circuit has established a two-part test to determine whether government actions amount to a taking of private property under the Fifth Amendment. See Casitas Mun. Water Dist. v. United States, 708 F.3d 1340, 1348 (Fed. Cir. 2013); Klamath Irr. Dist. v. United States, 635 F.3d 505, 511 (Fed. Cir. 2011); Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1372 (Fed. Cir.) (citing M & J Coal Co. v. United States, 47 F.3d 1148, 1153-54 (Fed. Cir.), cert. denied, 516 U.S. 808 (1995)) reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005); see also United Affiliates Corp. v. United States, 143 Fed. Cl. 257, 262 (2019) ("A takings claim is evaluated under a two-part analysis." (citing Acceptance Ins. Cos. v.

United States, 583 F.3d 849, 854 (Fed. Cir. 2009))). A court first determines whether a plaintiff possesses a cognizable property interest in the subject of the alleged takings. See Casitas Mun. Water Dist. v. United States, 708 F.3d at 1348; Christy, Inc. v. United States, 141 Fed. Cl. 641, 657 (2019) (holding that "[t]o prevail on a takings claim, a plaintiff must 'identify[ ] a valid property interest' under the Fifth Amendment" (citations omitted)); Jackson v. United States, 135 Fed. Cl. 436, 444 (2017) (citation omitted). Then, the court must determine whether the government action is a "'compensable taking of that property interest.'" Huntleigh USA Corp. v. United States, 525 F.3d at 1377 (quoting Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d at 1372).

To establish a taking, a plaintiff must have a legally cognizable property interest, such as the right of possession, use, or disposal of the property. See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982) (citing United States v. Gen. Motors Corp., 323 U.S. 373 (1945)); Welty v. United States, 926 F.3d 1319, 1323-24 (Fed. Cir. 2019) ("To maintain a cognizable claim for a Fifth Amendment taking, a plaintiff must establish that he possessed an enforceable property right." (citing Lucas v. S.C. Coastal Council, 505 U.S. at 1014-19)); Piszel v. United States, 833 F.3d 1366, 1374 (Fed. Cir. 2016), cert. denied, 138 S. Ct. 85 (2017); Rogers v. United States, 814 F.3d 1299, 1303 (Fed. Cir. 2015); Casitas Mun. Water Dist. v. United States, 708 F.3d at 1348; CRV Enters., Inc. v. United States, 626 F.3d 1241, 1249 (Fed. Cir. 2010), cert. denied, 563 U.S. 989 (2011); Karuk Tribe of Cal. v. Ammon, 209 F.3d 1366, 1374-75 (Fed. Cir.), reh'g denied and en banc suggestion denied (Fed. Cir. 2000), cert. denied, 532 U.S. 941 (2001); see also Reid v. United States, 143 Fed. Cl. 661, 668 (2019) (finding that "[i]n takings matters, a protectable property interest must be a 'legally-recognized property interest such as one in real estate, personal property, or intellectual property'" (quoting Adams v. United States, 391 F.3d 1212, 1224 (Fed. Cir. 2004))). "'It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation.'" Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 (quoting Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001), cert. denied, 353 U.S. 1077 (2002); and citing Cavin v. United States, 956 F.2d 1131, 1134 (Fed. Cir. 1992)). Therefore, "[i]f the claimant fails to demonstrate the existence of a legally cognizable property interest, the courts [sic] task is at an end." Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 (citing Maritrans Inc. v. United States, 342 F.3d 1344, 1352 (Fed. Cir. 2003); and M & J Coal Co. v. United States, 47 F.3d at 1154). The court does not address the second step "without first identifying a cognizable property interest." Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1213 (Fed. Cir.) (citing Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1381; and Conti v. United States, 291 F.3d 1334, 1340 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2002), cert. denied, 537 U.S. 1112 (2003)), reh'g denied and reh'g en banc denied (Fed. Cir. 2005); see also Love Terminal Partners, L.P. v. United States, 889 F.3d 1331, 1339 (Fed. Cir. 2018) ("As a threshold matter, 'the existence of a valid property interest is necessary in all takings claims.'" (quoting Wyatt v. United States, 271 F.3d 1090, 1097 (Fed. Cir. 2001)), cert. denied, 139 S. Ct. 2744 (2019); Balagna v. United States, 135 Fed. Cl. 16, 22 (2017), recons. denied, No. 14-21L, 2017 WL 5952123 (Fed. Cl. Dec. 1, 2017). Only if there is to be a next step, "'after having identified a valid property interest, the court must determine whether the governmental action at issue amounted to a compensable taking of that property

interest.'" <u>Huntleigh USA Corp. v. United States</u>, 525 F.3d at 1378 (quoting <u>Am. Pelagic Fishing Co. v. United States</u>, 379 F.3d at 1372); <u>see</u> <u>also</u> <u>Love Terminal Partners, L.P. v. United States</u>, 889 F.3d at 1339 (citing <u>First English Evangelical Lutheran Church of Glendale v. Los Angeles County, California</u>, 482 U.S. 304, 315 (1987)); <u>Casitas Mun. Water Dist. v. United States</u>, 708 F.3d at 1348.

In <u>Arkansas Game & Fish Commission v. United States</u>, the United States Supreme Court recognized five criteria relevant to analyzing whether government-induced flooding results in a compensable taking of a property interest. <u>See</u> <u>Ark. Game & Fish Comm'n v. United States</u>, 568 U.S. at 38-39. A Judge of the United States Court of Federal Claims summarized the <u>Arkansas Game & Fish Commission</u> criteria as a five-factor test that examines:

(1) time—the duration of the physical invasion; (2) causation; (3) intent or foreseeability, that is, "the degree to which the invasion is intended or is the foreseeable result of authorized government action;" (4) "the owner's reasonable investment-backed expectations regarding the land's use," including "the character of the land;" and (5) the "[s]everity of the interference."

<u>In re Upstream Addicks & Barker (Texas) Flood-Control Reservoirs</u>, 138 Fed. Cl. at 665 (quoting <u>Ark. Game & Fish Comm'n v. United States</u>, 568 U.S. at 38-39; and citing <u>Ark. Game & Fish Comm'n v. United States</u>, 736 F.3d 1364, 1369-75 (Fed. Cir. 2013)).

Defendant's motion to dismiss first alleges that plaintiffs have not stated a cognizable claim upon which relief can be granted because "there is no compensable taking when the government engages in an unavoidable, reasonable exercise of the police power that serves the public interest, particularly where there is an extreme threat to public health, safety, or welfare." Defendant asserts that "the Bureau [of Reclamation] increased the release flow from Olympus Dam in the midst of an emergency to save lives and property." Therefore, defendant argues, "its actions were a constitutional exercise of the government's police power, not a taking." Defendant asserts in its motion to dismiss that the United States Supreme Court found in <u>Miller v. Schoene</u> that "[s]uch a choice, in furtherance of the public interest, 'is one of the distinguishing characteristics of every exercise of the police power which affects property.'" (quoting <u>Miller v. Schoene</u>, 276 U.S. at 279-80). In <u>Miller v. Schoene</u>, Virginia landowners were required to cut down cedar trees under a Virginia statute enacted to prevent cedar rust infections to the state's susceptible apple orchards. <u>See</u> <u>Miller v. Schoene</u>, 276 U.S. at 277. The United States Supreme Court held that landowners were not entitled to compensation for trees lost because the statute was enacted "under the necessity of making a choice between the preservation of one class of property and that of the other wherever both existed in dangerous proximity." <u>Id.</u> at 279.

In response, plaintiffs argues that "defendant's police power cases do not apply," and also argue that "[n]one of the regulatory taking police power cases cited by Defendant consider physical appropriation of land by the Government in order to protect its own

property. No case law is cited by Defendant that effectively [sic] permanent taking of real estate under police powers trumps the Fifth Amendment prohibition on taking property without just compensation." Plaintiffs further contend that <u>Arkansas Game & Fish Commission v. United States</u>, 568 U.S. at 33, a case relied upon by defendant in its motion to dismiss, "cites numerous examples of wartime temporary taking of property that were compensable where the Government took outright physical possession of property or directly and immediately interfered with the owner's enjoyment and use of the land," including <u>United States v. Pewee Coal Co.</u>, 341 U.S. 114 (1951), in which the United States seized a coal mine, <u>Kimball Laundry Co. v. United States</u>, 338 U.S. 1 (1949), in which the United States used laundry and dry cleaning services for military personnel and <u>United States v. General Motors Corp.</u>, 323 U.S. 373 (1945), in which the United States used a General Motors warehouse. <u>See</u> Ark. Game & Fish Comm'n v. United States, 568 U.S. at 33 (in each case the Supreme Court noted "[t]hese exercises of government authority . . . qualified as compensable temporary takings"). Plaintiffs allege that the "direct" and "permanent" "appropriation of Plaintiffs' land by the government's action" is "sufficient to establish a takings claim."

Although in the motion to dismiss defendant seems to rely in part on the concept of police powers to establish that plaintiffs have failed to state a claim, defendant's reply brief shifts the focus of defendant's argument to the doctrine of public necessity, which defendant similarly argues acts as a bar to plaintiffs' takings claim.[3] Defendant contends

---

[3] Plaintiffs point out that defendant couched its police power argument in its motion to dismiss on regulatory takings case law. The above captioned case addresses a physical taking and the framework for analyzing regulatory takings as compared to physical takings is quite different. Regulatory takings involve "restrictions on the use of . . . property," and a determination of whether such restrictions constitute a compensable taking requires "balancing and 'complex factual assessments,' utilizing the so-called *Penn Central* test." <u>CRV Enterprises, Inc. v. United States</u>, 626 F.3d 1241, 1246 (Fed. Cir. 2010) (quoting <u>Tahoe–Sierra Pres. Council v. Tahoe Reg'l Planning Agency</u>, 535 U.S. 302, 322–23 (2002)); <u>see also</u> <u>Kaiser Aetna v. United States</u>, 444 U.S. 164, 175 (1979) (citing <u>Penn Cent. Transp. Co. v. City of New York</u>, 438 U.S. 104, 124 (1978)) (noting the Supreme Court "has examined the 'taking' question by engaging in essentially ad hoc, factual inquiries that have identified several factors-such as the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the governmental action-that have particular significance"); <u>Penn Cent. Transp. Co. v. City of New York</u>, 438 U.S. at 105, 124. In contrast, as explained by the United States Court of Appeals for the Federal Circuit:

A physical taking is the "paradigmatic taking" and occurs by "a direct government appropriation or [a] physical invasion of private property." <u>Lingle v. Chevron U.S.A., Inc.</u>, 544 U.S. 528, 537, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005). The jurisprudence pertaining to physical takings "involves the straightforward application of <u>per se</u> rules." <u>Brown v. Legal Found. of Wash.</u>, 538 U.S. 216, 233, 123 S.Ct. 1406, 155 L.Ed.2d 376 (2003) (emphasis in original). The size and scope of a physical invasion is immaterial to the analysis; even if the government only appropriates a tiny

in its reply in support of its motion to dismiss that, according to the United States Supreme Court, "'[a]t the common law every one had the right to destroy real and personal property, in cases of actual necessity, to prevent the spreading of a fire, and there was no responsibility on the part of such destroyer, and no remedy for the owner.'" (quoting Bowditch v. City of Boston, 101 U.S. 16, 18 (1879)). Further, quoting Bowditch v. City of Boston, defendant claims that "'[t]here are many other cases besides that of fire,—some of them involving the destruction of life itself,—where the same rule is applied. The rights of necessity are a part of the law.'" (quoting Bowditch v. City of Boston, 101 U.S. at 18-19 (quoting Respublica v. Sparhawk, 1 Dall. 357, 362 (Pa. 1788))) (internal quotation marks omitted). Defendant also cites to a footnote in the United States Supreme Court case, Lucas v. South Carolina Coastal Council, a case also cited by plaintiff, which defendant argues, makes "clear that government would not owe compensation 'for the destruction of "real and personal property, in cases of actual necessity, to prevent the spreading of a fire" or to forestall other grave threats to the lives and property of others.'" (quoting Lucas v. S. C. Coastal Council, 505 U.S. at 1029 n.16 (quoting Bowditch v. City of Boston, 101 U.S. at 18-19)). Defendant further argues that the Supreme Court in Lucas v. South Carolina Coastal Council "made no attempt to limit the principle to alleged regulatory takings," implying physical takings, like flooding cases, could be applicable to the court's consideration. Defendant concedes, however, that case of the Lucas v. South Carolina Coastal Council addressed whether a state regulation effected a taking.[4]

The Supreme Court has stated that "the common law had long recognized that in times of imminent peril—such as when fire threatened a whole community—the sovereign could, with immunity, destroy the property of a few that the property of many and the lives of many more could be saved." United States v. Caltex, 344 U.S. 149, 154 (1952) (footnote omitted); see also Bowditch v. City of Boston, 101 U.S. at 16, 18-19. According to the Federal Circuit, however, the doctrine of necessity cannot be automatically applied in order to absolve defendant of its obligations under the Takings Clause; rather, "the doctrine of necessity may be applied only when there is an imminent danger and an actual emergency giving rise to actual necessity." TrinCo Inv. Co. v. United States, 722 F.3d at 1378 (citing United States v. Caltex, 344 U.S. at 154; Ralli v. Troop, 157 U.S. 386, 405 (1895); Bowditch v. City of Boston, 101 U.S. at 16-19; and Mitchell v. Harmony, 54 U.S. 115, 135 (1851)). "The Supreme Court acknowledged that '[n]o rigid rules can be laid down to distinguish compensable losses from non-compensable losses' and that '[e]ach

_____

slice of a person's holdings, a taking has occurred, and the owner must be provided just compensation. Tahoe–Sierra, 535 U.S. at 322.

Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1288 (Fed. Cir. 2008).

[4] Plaintiffs responds to defendant's citation to the United States Supreme Court's decision in Lucas v. South Carolina Coastal Council by arguing that the Supreme Court "recognized that there is an analytical distinction between cases in which the government compels the property owner to suffer a physical appropriation of the owner's property, versus regulation that denies the owner economically beneficial use of land." (emphasis in original) (citing Lucas v. S.C. Coastal Council, 505 U.S. at 1014-15).

case must be judged on its own facts.'" TrinCo Inv. Co. v. United States, 722 F.3d at 1379 (alterations in original) (quoting United States v. Caltex, 344 U.S. at 156).

According to defendant's reply, "if the facts as pleaded in a complaint asserting a Fifth Amendment taking demonstrate an imminent danger and actual emergency threatening lives and property that necessitates the government action at issue, then the complaint fails to state a claim upon which relief can be granted." (citing TrinCo Inv. Co. v. United States, 722 F.3d 1375, 1380 (Fed. Cir. 2013)). As the actions of the Bureau of Reclamation in this complaint were responding to "a declared state of emergency," defendant argues "any harm to private property was not a compensable taking."

In TrinCo Investment Co. v. United States, a series of wildfires burned through the Shasta-Trinity National Forest. See id. at 1377-78. To combat the wildfires, the United States Forest Service lit intentional fires on and around Trinco Investment Company's (TrinCo's) properties, resulting in widespread damage to TrinCo's land. See id. TrinCo's complaint advanced a takings claim which alleged that, in the absence of the fires, TrinCo's land would not have sustained damage. See id. In TrinCo Investment Co. v. United States, the United States Court of Federal Claims initially granted the government's motion to dismiss, concluding that the doctrine of necessity absolved the government of liability. See TrinCo Inv. Co. v. United States, 106 Fed. Cl. 98, 102 (2012), rev'd, 722 F.3d 1375 (Fed. Cir. 2013). The Court of Federal Claims held that "[s]ince the government is not required to compensate plaintiffs for property destroyed when the government acts '[t]o prevent the spreading of a fire,' plaintiffs have not stated a claim for which relief can be granted." Id. (quoting Omnia Commercial Co. v. United States, 261 U.S. 502, 508 (1923)). The United States Court of Appeals for the Federal Circuit reversed, finding that "[i]t is impossible, without further inquiry, to determine whether the requisite imminent danger and actual emergency giving rise to the actual necessity of the Forest Service's burning of TrinCo's property was present to absolve the Government under the doctrine of necessity." TrinCo Inv. Co. v. United States, 722 F.3d at 1380. According to the Federal Circuit:

> While there is no doubt that there was a fire, there is also no doubt that at the time TrinCo's property was burned, only approximately 2% of the 2.1 million-acre national forest was in flames. It is clearly relevant to the present case to learn in discovery why the Plaintiff's property had to be sacrificed, as opposed to other property, including other portions of the National Forest itself.

Id. The Federal Circuit concluded, that TrinCo's complaint was "sufficient to survive dismissal at this early stage of the proceedings." See id.

The case before the court does not involve fire as in TrinCo Investment Co. or Bowditch v. City of Boston, but instead involves flooding. Plaintiffs in the above captioned case allege that "[b]efore 11:30pm on September 12, 2013, the Bureau of Reclamation decided it needed to protect the integrity of the dam by opening the flood gates and dramatically increasing the outflow of water." Plaintiffs contend that this "sudden and

enormous release of water from the Olympus Dam," according to one report, more than 5200 cfs, "caused catastrophic floodwater flow in the Big Thompson River below the dam" that "permanently removed land, permanently reshaped the river banks, and destroyed the Plaintiffs' real and personal property." Plaintiffs argue they are similarly positioned to the plaintiff in TrinCo Investment Co. v. United States in that they have alleged sufficient facts to survive a motion to dismiss. See TrinCo Inv. Co. v. United States, 722 F.3d at 1380. Just as defendant alleges in its motion to dismiss in the above-captioned case that "a breach or failure of the dam would cause massive additional flooding in the midst of an already-existing emergency," in TrinCo Investment Co. v. United States, the defendant similarly alleged in its response to plaintiffs' appeal before the Federal Circuit, that "an emergency was underway and . . . the Forest Service was acting to control the spread of wildfires, thereby forestalling threats to property." Answering Brief of Defendant-Appellee at 35, TrinCo Inv. Co. v. United States, 2013 WL 607106, at *35 (Fed. Cir. Feb. 7, 2013) (citing Lucas v. S.C. Coastal Council, 505 U.S. at 1029 n.16). As indicated above, in TrinCo Investment Co. v. United States, the Federal Circuit determined that, without further discovery, the "requisite imminent danger and actual emergency" could not be determined in a motion to dismiss proceeding. See TrinCo Inv. Co. v. United States, 722 F.3d at 1380. The court in the instant case likewise needs more information to determine the nature of the emergency and if imminent danger was present when the Bureau of Reclamation made its decisions about the Olympus Dam.

The defendant further alleges that plaintiffs' current complaint should be dismissed because plaintiffs "have failed to plead sufficient factual allegations to support causation, a key element of their takings claim." According to defendant's motion to dismiss, "to successfully plead a taking, a plaintiff must, among other things, allege, with factual support, that 'in the ordinary course of events, absent government action, [the] plaintiff[] would not have suffered the injury.'" (alterations in original) (citing St. Bernard Parish Gov't v. United States, 887 F.3d 1354, 1362 (Fed Cir. 2018), cert. denied, 139 S. Ct. 796 (2019)). Defendant contends that "[h]ere, that means Plaintiffs must have pleaded [sic], with sufficient factual support, that absent the government's increased release of water from Olympus Dam on September 12, 2013, Plaintiffs' lands would not have flooded. They have failed to do so." Defendant argues that plaintiffs' case is "on all fours" with Accardi v. United States, 220 Ct. Cl. 347, 599 F.2d 423 (1979). According to defendant, in Accardi v. United States, "plaintiffs owned land along a river in California and asserted that by the government's operation of part of the Central Valley Project, their properties were flooded, and therefore taken." Defendant contends that in Accardi v. United States, the United States Court of Claims dismissed plaintiffs' complaint because, "even though the plaintiffs had property that was washed away or damaged, they failed to prove causation because had the dam 'not been in operation . . . plaintiffs' real properties . . . would have experienced the full force of [the] peak inflow,'" and "[b]ecause the flooding that actually occurred to their properties was far less than would have been the case absent the dam, there was 'no taking of plaintiffs' property.'" (quoting Accardi v. United States, 220 Ct. Cl. at 357-58, 599 F.2d at 429-30) (alterations and omissions in original). Applying the logic of the United States Court of Claims in Accardi v. United States to the above captioned case, defendant argues that the

fact that the water flowed through the dam does not raise any reasonable inference that the dam somehow created additional flooding. Plaintiffs have not plead any facts supporting a conclusion that the dame somehow created additional flooding. To the contrary, their repeated references to the historic nature of the storm only support the inference that their properties would have flooded regardless.

Plaintiffs respond that they have alleged facts that:

[T]he Government more than doubled the flow of water from the Olympus Dam at approximately 11:30 pm on September 12, 2013, to 5200 cfs. Early in the morning of September 13, 2013, shortly after this sudden increase in flow, Plaintiffs' properties were washed away. Accordingly, there is a close temporal link from which a reasonable inference can be drawn that the sudden and dramatic increase (more than doubling) in water flow caused the properties to flood and wash away.

Similar to the circumstances of the above-captioned case, in Accardi v. United States, plaintiffs owned property downstream from the Trinity Dam, operated by the Bureau of Reclamation, which held back the waters of the Clair Engle Lake. See Accardi v. United States, 220 Ct. Cl. at 349-52. In January 1974, a storm struck and stalled over the region, resulting in a peak inflow of 107,700 cfs and "a mean daily inflow of 72,500" cfs. See id. at 354. As a result of the storm, water flowed through the Trinity Dam and into the Trinity River "at a rate of about 14,800" cfs which washed away the Accardi plaintiffs' property and resulted in "severe soil erosion." See id. at 354-55. In Accardi v. United States, the United States Court of Claims stated that the flow through the Trinity Dam was "less than 15 percent of the recorded peak inflow" during the storm. See id. at 355. According to the Accardi court, "[h]ad Trinity Dam not been in operation in January 1974, both the peak inflow and the entire inflow then recorded would necessarily have flowed down the Trinity River." Id. The United States Court of Claims held that "it is fair to find from this record that the flooding which actually occurred in consequence of that storm was far less than would have been the case" in absence of the dam and, therefore, "there [was] no taking of plaintiffs' property." Id. at 358. Unlike in Accardi v. United States, plaintiffs in the above captioned case describe peak inflows as "swelling Lake Estes at times faster than 4,000 cfs," and the peak outflows from the Olympus Dam which affected plaintiffs' property, however, were "more than 5,200 cfs." Further, unlike in Accardi v. United States, in which the outflow from the Trinity Dam was a mere "15 percent of the recorded peak inflow," Accardi v. United States, 220 Ct. Cl. at 355, plaintiffs allege that the outflow from the Olympus Dam in the above-captioned case was potentially 125% in excess of the peak inflow. In Accardi, the court concluded that it had sufficient evidence to establish that the damage sustained by plaintiffs was far less than it would otherwise have been, but for the release of water from the Trinity Dam. See id. at 358. In the plaintiffs' case currently before the court, based on the complaint, the same conclusion is not readily apparent as to whether less water would have flowed in the absence of the Olympus Dam's release.

In <u>St. Bernard Parish Government v. United States</u>, 887 F.3d at 1362, the United States Court of Appeals for the Federal Circuit stated that, in order to establish causation, a plaintiff bears the burden of showing "'what would have occurred' if the government had not acted." <u>St. Bernard Parish Gov't v. United States</u>, 887 F.3d at 1362 (quoting <u>United States v. Archer</u>, 241 U.S. 119, 132 (1916)). In <u>St. Bernard Parish</u>, plaintiffs alleged that the government was liable for flood damage to their properties caused by Hurricane Katrina. <u>See id.</u> at 1357. In <u>St. Bernard Parish</u>, the Federal Circuit explained that "[i]n 1956, Congress authorized the [Army Corps of Engineers] Corps to construct the MRGO [Mississippi River-Gulf Outlet] navigation channel in New Orleans. The purpose of the channel was to increase commerce by providing a direct connection between the port of New Orleans and the Gulf of Mexico." <u>Id.</u> The plaintiffs in <u>St. Bernard Parish</u> alleged that "over the course of the next several decades, the construction, operation, and improper maintenance of the MRGO channel caused various adverse impacts that increased storm surge along the channel." <u>Id.</u> The Federal Circuit noted that the <u>St. Bernard Parish</u> plaintiffs brought suit under the Tucker Act, "alleging that construction and operation of MRGO and failure to properly maintain or modify it constituted a taking by causing flooding damage to their properties," but that "[p]laintiffs made no effort to show that the combination of MRGO and the LPV levees caused more flooding than would have occurred without any government action, arguing that the court should limit its consideration to MRGO in isolation." <u>Id.</u> at 1358. The Federal Circuit concluded "[h]ere, the plaintiffs failed to present evidence comparing the flood damage that actually occurred to the flood damage that would have occurred if there had been no government action at all." <u>Id.</u> at 1363. According to the Federal Circuit, "plaintiff must show that in the ordinary course of events, absent government action, plaintiffs would not have suffered the injury." <u>Id.</u> at 1362.

Plaintiffs' allegations, including regarding that the volume of the inflow from the storm into Lake Estes was less than the outflow released by the Bureau of Reclamation through the Olympus Dam, and the absence of information as to the amount of water that would have flowed absent Olympus Dam's release, demonstrate that plaintiffs have "state[d] a claim of relief that is plausible on its face," which, as noted in <u>Quebedeaux</u>, is standard articulated in <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678, to state a claim in a motion to dismiss proceeding "'does not require the plaintiff to set out in detail the facts upon which the claim is based, but enough facts to state a claim to relief that is plausible on its face.'" <u>Quebedeaux v. United States</u>, 112 Fed. Cl. 317, 321, 325 (2013) (quoting <u>Cary v. United States</u>, 552 F.3d at 1376) (in denying the defendant's motion to dismiss, "plaintiffs should be given the opportunity to develop facts in support for their claims via discovery"). Further information, not yet developed by the parties, is required for the court to reach conclusions about the flooding from the Olympus Dam and the merit of any potential claims by plaintiffs. The court emphasizes the burden remains on plaintiffs to develop the facts as to whether or not the flooding would have been greater if water the Olympus Dam had not been released, or not been released in the quantities plaintiffs have alleged were released in September 2013.

Defendant separately contends in its motion to dismiss that plaintiffs' complaint should be dismissed, as "[p]laintiffs have not pleaded [sic] an invasion of a property

interest amounting to appropriation. They have, at most, pleaded a tort." In support of its assertion, defendant argues that plaintiffs' "attempt to establish the contours of reasonable cause in operating the dam," is an allegation that "sounds in tort." (citing <u>St. Bernard Parish Gov't v. United States</u>, 887 F.3d at 1360). Defendant alleges that

> [a]ny claim that the Bureau failed to operate the dam correctly is not a takings claim because "[o]n a takings theory, the government cannot be liable for failure to act, but only for affirmative acts." <u>Id.</u> [<u>St. Bernard Parish Gov't v. United States</u>, 887 F.3d at 1360] Moreover, even to the extent Plaintiffs target action, in the form of the Bureau's release beginning the evening of September 12, on a takings theory the proper comparison is not between what happened and what the government should have done, but between what happened and what would have happened had the government not acted at all. <u>See</u> <u>id.</u> at 1359, 1362.

Defendant also contends that its assertion that the plaintiffs' claim "sets forth, at most, a tort not a taking, is further borne out by comparison to Plaintiffs' earlier claim for negligence in district court." Further, defendant argues that "the tort-taking framework established by [the United States Court of Appeals for] the Federal Circuit in <u>Ridge Line [v. United States</u>, 346 F.3d 1346, 1355 (Fed. Cir. 2003)] confirms that Plaintiffs have not pleaded a takings claim."

In their response in opposition to defendant's motion to dismiss, plaintiffs "acknowledge that they originally pursued alternative claims under the Federal Tort Claims Act and [sic] United States District Court for the District of Colorado. However, those claims were dismissed voluntarily, and Plaintiffs are not asserting those claims in this action." Therefore, plaintiffs argue, "it is immaterial whether or not Plaintiffs originally raised those claims as alternative grounds for relief." Plaintiffs also assert that their inclusion in the instant complaint of "[a]dditional facts alleging negligent conduct [does] not diminish the specific factual allegations that establish Plaintiffs' inverse condemnation claim" and does "not justify dismissal."

As acknowledged by both the plaintiffs and the defendant in the above-captioned case, this court does not possess jurisdiction over claims that sound in tort. <u>See</u> 28 U.S.C. § 1491(a) (2018) ("The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."); <u>see also</u> <u>Keene Corp. v. United States</u>, 508 U.S. 200, 214 (1993); <u>Rick's Mushroom Serv., Inc. v. United States</u>, 521 F.3d 1338, 1343 (Fed. Cir. 2008); <u>Alves v. United States</u>, 133 F.3d 1454, 1459 (Fed. Cir. 1998); <u>Brown v. United States</u>, 105 F.3d 621, 623 (Fed. Cir.), <u>reh'g denied</u> (Fed. Cir. 1997); <u>Golden Pac. Bancorp v. United States</u>, 15 F.3d 1066, 1070 n.8 (Fed. Cir.), <u>reh'g denied</u>, <u>en banc suggestion declined</u> (Fed. Cir.), <u>cert. denied</u>, 513 U.S. 961 (1994); <u>Langan v. United States</u>, 143 Fed. Cl. 416, 423 (2019); <u>Hampel v. United States</u>, 97 Fed. Cl. 235, 238, <u>aff'd</u>, 429 F. App'x 995 (Fed. Cir. 2011), <u>cert. denied</u>, 132 S. Ct. 1105 (2012);

Woodson v. United States, 89 Fed. Cl. 640, 650 (2009); McCullough v. United States, 76 Fed. Cl. 1, 3 (2006), appeal dismissed, 236 F. App'x 615 (Fed. Cir.), reh'g denied (Fed. Cir.), cert. denied, 552 U.S. 1050 (2007); Agee v. United States, 72 Fed. Cl. 284, 290 (2006); Zhengxing v. United States, 71 Fed. Cl. 732, 739, aff'd, 204 F. App'x 885 (Fed. Cir.), reh'g denied (Fed. Cir. 2006).

In Ridge Line, Inc. v. United States the United States Court of Appeals for the Federal Circuit set forth a two-part analysis to assist lower courts in "distinguishing potential physical takings from possible torts." Ridge Line, Inc. v. United States, 346 F.3d at 1355. In Ridge Line, after the United States Postal Service built a facility adjacent to and uphill from the shopping center owned by plaintiff Ridge Line, storm water runoff "increased due to the construction of impervious surfaces on much of the government land," by 70–150%. Id. at 1351. Both the shopping center and the Postal Service facility drained into a ravine called South Hollow. See id. The Federal Circuit stated:

> According to Ridge Line's evidence, approximately 80% of post-development runoff into South Hollow in 1993 was coming from the Postal Service property as opposed to Ridge Line's property. Although the Postal Service facility included a drainage swale and drains and the Postal Service constructed a check dam on Ridge Line's property in South Hollow to control runoff, Ridge Line notes that storm water runoff into South Hollow became so extreme that it began to receive complaints of flooding from downstream neighbors, including a homeowner along Davis Creek which is fed by the effluent from South Hollow.

Id. The Federal Circuit reversed the trial court and explained that the court had "failed to address Ridge Line's principal contention: whether the increased water runoff constituted a taking of a flowage easement by inverse condemnation." Id. at 1355.

The Federal Circuit articulated its two-prong test to determine if a potential physical taking has occurred, or if a tort has taken place.  First, a compensable taking will only arise in situations in which "the government intends to invade a protected property interest or the asserted invasion is the 'direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action.'" Id. at 1355-56 (quoting Columbia Basin Orchard v. United States, 132 Ct. Cl. 445, 450, 132 F. Supp. 707, 709 (1955)). Second, courts must consider "the nature and magnitude of the government action." See id. According to the Federal Circuit, to constitute a taking under the second prong under the Ridge Line analysis, "an invasion must appropriate a benefit to the government at the expense of the property owner, or at least preempt the owners right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value." See id. (citing S. Pac. Co. v. United States, 58 Ct. Cl. 428 (1923) (citations omitted)). The Federal Circuit in Ridge Line, noted, however, that "not every 'invasion' of private property resulting from government activity amounts to an appropriation." Id. at 1355 (citing 9 Patrick J. Rohan & Melvin A. Resking, Nichols on Eminent Domain § 34.03[1] (3d ed. 1980 & Supp. 2002)). The Federal Circuit concluded that

since Ridge Line does not allege that the government intentionally appropriated its property, on remand the court must first determine whether Ridge Line proved that the increased storm runoff was the direct, natural, or probable result of the Postal Service development, rather than merely an incidental or consequential injury, perhaps compensable as a tort, caused, for example, by improvident conduct on the part of the government in managing its property. Specifically, the court must determine whether the increased runoff on the claimants property was the predictable result of the government action.

Id. at 1356. Additionally, the Federal Circuit instructed that "[i]f the court concludes that treatment of the government's conduct as a potential taking, as opposed to a tort, is appropriate, it must then consider whether the government appropriated from Ridge Line a legally protectable easement interest." Id. at 1357.

In considering whether to apply the two-part Ridge Line test in the context of a motion to dismiss, a Judge of the United States Court of Federal Claims has stated "[t]hese multifaceted approaches, heavily imbued, as they are, with factual considerations, strongly militate against the adoption of a bright-line rule that would require this court to dismiss plaintiffs' complaint." Quebedeaux v. United States, 112 Fed. Cl. at 325. In Quebedeaux v. United States, plaintiffs filed suit to compensate for flooding of their property and the corresponding damage. As indicated by the Quebedeaux court:

The Morganza Floodway, which includes the Morganza Spillway, is part of the Mississippi River & Tributaries Project (the MR&T Project)—the comprehensive federal system of levees, flood control channels, dams, pumping stations, and reservoirs designed to control floods on the Mississippi River. The Morganza Spillway is a structure on the Mississippi River that sits at the head of the Morganza Floodway. This 3,900–foot structure features 125 floodgates and other structures. Ordinarily, the Spillway gates remain closed. However, during flood events, the Morganza Spillway can be opened to divert water through the Morganza Floodway into the Atchafalaya River basin. Upriver on the Mississippi from the Morganza Spillway lies another flood control structure, the Old River Control Structure. This is used routinely to divert water from the Mississippi River into the Atchafalaya River basin. The Morganza Spillway is opened only during extreme flood events to divert additional water into the Atchafalaya River basin. The Morganza Spillway has been opened only twice—once during a 1973 flood, and again on or about May 14, 2011, during the flood event that underlies plaintiffs' lawsuit. In the latter instance, the Army Corps of Engineers (the Corps) became concerned that flooding along the Mississippi River would overwhelm the levees in Baton Rouge and New Orleans. After considering several alternatives, the Corps decided to open the Morganza Spillway to 21 percent of its maximum capacity to prevent flooding downriver. As a consequence, the Morganza Floodway, the Atchafalaya River basin, and its residents and property owners were

> inundated with flood waters between May 14, and July 7, 2011. According to plaintiffs, this flooding destroyed, damaged and/or devalued their crops, farms, homes, businesses, buildings, structures, equipment, oil and gas wells, fishery waters, and other real and personal property.

Id. at 319-20. In response to the motion to dismiss for failure to state a claim upon which relief can be granted, the Quebedeaux court denied defendant's motion to dismiss, based on the fact-intensive nature of the Ridge Line inquiry, determining that "plaintiffs should be given the opportunity to develop facts in support of their claims via discovery." Id. at 325.[5] The above captioned case, like the Ridge Line case and the Quebedeaux case, involves flooding and requires further fact-intensive inquiry to determine if a taking has occurred. As noted above, plaintiffs allege that that on September 13, 2013, "[a]ccording to one report, at 11:30 p.m., the Bureau of Reclamation opened flood gates and increased the release flow from the Olympus Dam to more than 5,200 cfs" and "continued to release water from the Olympus Dam at rates near or above 5,000 cfs throughout most of the early morning hours of September 13, 2013." According to the complaint, the "sudden and enormous release of water from the Olympus Dam caused catastrophic" flooding below the dam "on the night of September 12-13, 2013 and continuing high release flows thereafter." Plaintiffs allege that they "lost substantially all of their homes, the business owned by the Carmans, and their personal property" as well as "large sections of the land and riverfront property owned by Plaintiffs," which were "displaced or permanently removed." As of the time defendant filed its motion to dismiss, the plaintiffs' allegations have not been confirmed or refuted. Like the plaintiffs in Quebedeaux, this court concludes that discovery is necessary to determine whether plaintiffs' allegations demonstrate a taking, and, therefore, plaintiffs should be given the opportunity to develop facts in support of their claims. The court notes that given plaintiffs' burden of proof regarding their claims, the court may be open to considering a motion for summary judgment by defendant if during discovery it appears that plaintiffs cannot develop the facts to support their claims.

---

[5] In Moden v. United States, the Court of Appeals for the Federal Circuit applied the Ridge Line test, albeit in the context of summary judgment, to conclude that "due to the fact-intensive nature of takings cases, summary judgment should not be granted precipitously." See Moden v. United States, 404 F.3d at 1342 (citing Yuba Goldfields, Inc. v. United States, 723 F.2d at 887); see also Ark. Game & Fish Comm'n v. United States, 568 U.S. at 31; In re Upstream Addicks & Barker (Texas) Flood-Control Reservoirs, 138 Fed. Cl. at 664.

**CONCLUSION**

For the foregoing reasons, defendant's motion to dismiss is **DENIED**. Future proceedings will be set by a separate Order.

**IT IS SO ORDERED.**

<u>s/Marian Blank Horn</u>
**MARIAN BLANK HORN**
          **Judge**